**THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MISSOURI**
**SOUTHWESTERN DIVISION**

SAMMIE SAPPINGTON, et al.,            )
                                      )
            Plaintiffs,               )
                                      )
    v.                                )
                                      ) No. 04-5076-CV-SW-FJG
SKYJACK INC., et al.,                 )
            Defendants.               )

**ORDER**

Pending before the Court are (1) defendant Skyjack Inc.'s Motion to Bar Bryan

Johnson (Doc. No. 85); (2) defendant Rental Service Corporation's Motion to Join

Defendant Skyjack, Inc.'s Motion to Bar Bryan Johnson (Doc. No. 86); (3) Defendant RSC's

Motion to Exclude Expert Testimony of Ken Blundell and Suggestions in Support (Doc. No.

81); (4) Defendant Skyjack Inc.'s Motion to Bar Dr. James Kenneth Blundell (Doc. No. 87);

(5) Motion to Strike January 17, 2006 Affidavit of J. Kenneth Blundell (Doc. No. 111); (6)

Plaintiffs' Motion to Strike Defendant Skyjack Inc.'s Motion for Summary Judgment (Doc.

No. 112); (7) Defendant Skyjack's motion for summary judgment (Doc. No. 104); (8)

Defendant RSC's Motion for Summary Judgment or in the Alternative Motion to Dismiss

(Doc. No. 100); (9) defendant Skyjack Inc.'s Motion to Bar John Ward, Ph.D. (Doc. No. 88);

(10) Plaintiffs' Motion Challenging Admissibility of Certain Expert Testimony Proffered by

Defendants (Doc. No. 83); (11) Plaintiffs' Motions in Limine and Suggestions in Support

(Doc. No. 166); (12) Defendant Skyjack Inc.'s Motions in Limine (Doc. No. 168); (13)

Defendant Rental Service Corporation, Inc.'s Motions in Limine (Doc. No. 170); (14)

Defendant Skyjack Inc.'s Motion to Amend and Correct Defendant's Response to the

Plaintiffs' Motions in Limine (Doc. No. 175); and (15) Defendant Skyjack Inc.'s Motion to

Join in Rental Service Corporation, Inc.'s Motions in Limine, Objections to Plaintiffs' Proposed Voir Dire and Objections to Plaintiffs' Proposed Jury Instruction 1.01 (Doc. No. 176). Each will be considered below.

## I. Background

On October 4, 2001, plaintiffs'[1] decedent, Doyle Sappington, suffered fatal injuries when the scissors lift he was operating tipped over. The lift at issue is a SJII 4626 manufactured by Skyjack Inc. ("Skyjack"). It was sold to Central States Equipment, and eventually came into the possession of Rental Service Corporation ("RSC"). Prior to October 3, 2001, RSC rented the lift at issue to Eliason & Knuth. Prior to October 3, 2001, the lift at issue was delivered to Eliason & Knuth at the Saks Fifth Avenue Parking Garage project at 47th and Pennsylvania. J.E. Dunn was the general contractor for the Saks Fifth Avenue Parking Garage project. On October 3, 2001, prior to the accident, the lift was in its "as manufactured" conduction, with the exception of normal wear and tear. On October 3, 2001, Doyle Sappington was employed as a carpenter foreman for J.E. Dunn. Prior to October 3, 2001, Doyle Sappington had received training on the safe and proper use of a scissor lift. On October 3, 2001, Doyle Sappington was a qualified operator of the lift at issue. Doyle Sappington took charge of the lift on October 3, 2001. Immediately before his injury, Doyle Sappington had the Skyjack SJII 4626, serial number 72595, elevated to about 26 feet in the air. Doyle Sappington was killed when the Skyjack SJII 4626, serial number 72595, he was operating drove backwards into the area where the sidewalk had been removed earlier, and fell to the ground.

---

[1]Plaintiff Evelyn Sappington is the decedent's mother. Plaintiff Sammie Sappington is his daughter, and plaintiff Justin Sappington is his son. Doyle Sappington apparently had another child from a previous marriage, but that child is not a plaintiff in this action.

2

Plaintiffs allege that the SJII 4626 was defective and unreasonably dangerous because it was not sufficiently stable to withstand having its wheels drop off a curb and it lacks what has been described in the industry as a "pothole protection system." The successor model to the SJII 4626 is the SJIII 4626. Plaintiffs claim that the SJIII 4626 was a reasonable alternative design which would have saved Sappington's life because of its enhanced stability and its ability to withstand operating and having both of its wheels fall off of a drop off at the same time. Skyjack began producing the SJIII 4626 in 1997. As of the date of the accident, RSC rented both SJII 4626 and SJIII 4626.

Plaintiffs also allege that certain American National Standards Institute ("ANSI") standards will be at issue in this case. These standards were developed by Scaffold Industry Association, Inc. (an industry group). The standards which are at issue are ANSI A92.1-1990 and ANSI A92.6-1999. Plaintiffs note the following chronology of events: (1) 1990 passage of ANSI 92.6-1990; (2) August 1995 manufacture of the lift at issue in this case; (3) 1997 production beginning as to the SJIII 4626 model; (4) 1999 passage of ANSI 92.6-1999; and (5) October 2001 Sappington accident.

## II. Daubert Motions

### A. Standard

As a preliminary matter, "[t]he proponent of the expert testimony must prove its admissibility by a preponderance of the evidence." Lauzon v. Senco Prods., Inc., 270 F.3d 681, 686 (8th Cir. 2001).

Federal Rule of Evidence 702 governs admissibility of expert testimony. See Fed. R. Evid. 702. "Rule 702 reflects an attempt to liberalize the rules governing the admission of expert testimony." Weisgram v. Marley Co., 169 F.3d 514, 523 (8th Cir. 1999), aff'd, 528 U.S. 440, 120 S. Ct. 1011, 145 L. Ed. 2d 445 (2000); see also Daubert [v. Merrell Dow Pharm., 509 U.S. 579, 588, 113 S. Ct. 2786 (citing Beech Aircraft Corp. v. Rainey, 488 U.S. 153, 169,

109 S. Ct. 439, 102 L. Ed. 2d 445 (1988)) (highlighting the "'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to 'opinion testimony'"). The rule clearly "is one of admissibility rather than exclusion." <u>Arcoren v. United States</u>, 929 F.2d 1235, 1239 (8th Cir. 1991).

> The proposed expert testimony must meet three prerequisites in order to be admitted under Rule 702. 4 Jack B. Weinstein & Margaret A. Berger, <u>Weinstein's Federal Evidence</u> § 702.02[3] (2001). First, evidence based on scientific, technical, or other specialized knowledge must be useful to the finder of fact in deciding the ultimate issue of fact. <u>Id.</u> This is the basic rule of relevance. Second, the proposed witness must be qualified to assist the finder of fact. <u>Id.</u> Third, "the proposed evidence must be reliable or trustworthy in an evidentiary sense, so that, if the finder of fact accepts it as true, it provides the assistance the finder of fact requires ...." <u>Id.</u>; <u>see</u> <u>also</u> <u>Daubert</u> 509 U.S. at 591, 113 S. Ct. 2786.

<u>Lauzon</u>, 270 F.3d at 686. In the seminal case regarding expert opinion testimony, <u>Daubert</u>

<u>v. Merrell Dow Pharmaceuticals</u>,

> the U.S. Supreme Court emphasized the district court's gatekeeper role when screening expert testimony for relevance and reliability.... <u>Daubert</u> provides a number of nonexclusive factors a court can apply in performing this role: 1) whether the theory or technique can be (and has been) tested; 2) whether the theory or technique has been subjected to peer review and publication; 3) the known or potential rate of error; and 4) whether the theory has been generally accepted.... <u>Daubert's</u> progeny provides additional factors such as: whether the expertise was developed for litigation or naturally flowed from the expert's research; whether the proposed expert ruled out other alternative explanations; and whether the proposed expert sufficiently connected the proposed testimony with the facts of the case.

270 F.3d at 686 - 87 (internal quotation marks and citations omitted).

> B.  Motion to Bar Testimony of Bryan Johnson (Doc. No. 85) and Motion to Join Motion to Bar Bryan Johnson (Doc. No. 86)

As a preliminary matter, defendant Rental Service Corporation's motion to join defendant Skyjack, Inc's motion to bar Bryan Johnson (Doc. No. 86) is **GRANTED.**

Defendant Skyjack states that Bryan Johnson's testimony should be barred. Bryan Johnson was retained by plaintiffs to perform a test on a Skyjack SJIII 4626. Johnson

drove it off a wooden platform at full speed, and it did not tip over.  However, Skyjack states there were numerous deviations between the test and the Sappington accident, rendering Johnson's test meaningless.

Defendant Skyjack states that the deviations between the accident and the test create significant problems as to the underline relevance of the test.  In his deposition, Johnson stated his assignment was to simulate the conditions at the time of Mr. Sappington's accident, and drive and SJIII 4626 off a curb under those conditions.  Johnson Depo. (Ex. A to Doc. No. 85), p. 29.  Johnson used the SJIII instead of the SJII, so that the "pothole protection" device could be tested.  He assumed that an SJIII 4626 was simply an SJII 4626 with pothole protection.  Id. p. 65.  However, the SJIII has a total weight of 4,850 pounds, whereas the SJII has a weight of 4178 pounds.  Defendant Skyjack notes that the increase in weight has an effect on center of gravity, and center of gravity is relevant in whether a particular lift will tip over.

Further, the weight placed on the lift platform is relevant.  Johnson assumed there were no materials on the platform when he performed the test.  However, photos taken after the accident showed siding materials and a toolbelt were on the lift.  These materials increased the weight on the platform by 84 pounds (see affidavit of Bruce Cone, J.E. Dunn's superintendent for the project, Doc. No. 93, Ex. E).  Defendant states that during the test, the lift's trailing wheels rose off the stage, the lift teetered for a moment, the trailing wheels came back down on the stage, and the lift remained upright.[2]  Defendant states that "we can only imagine what an additional 84 pounds on that platform 26 feet in the air, would

---

[2]The Court was not provided a copy of the videotape of this test, and therefore cannot independently verify how the SJIII responded during testing.

have had on the stability of this lift."[3]

Defendant Skyjack states, to be a relevant simulation of the Sappington accident on a theoretical SJII 4626 with pothole protection, Johnson would have needed to remove 672 pounds from the base of the test lift, and add 84 pounds to the platform. If Johnson was attempting to show that Sappington would have remained upright using an SJIII 4626 instead of an SJII, he still would have needed to add 84 pounds to the platform of the test lift to accurately portray accident conditions. Neither of these were done. Further, defendant states that, "Simply because the plaintiffs, post-accident, have identified a device which they feel might have prevented this single accident, does not render the product unreasonably dangerous for not having it." Additionally, defendant states that the finding that the SJIII 4626 could survive a drop-off in poorly reproduced test conditions is irrelevant to the Sappington SJII 4626 accident in real-world conditions, as nothing has shown that an SJII 4626 equipped with pothole protection would have not tipped.

Plaintiffs respond that defendant Skyjack "fails to mention" that the SJIII 4626 has been tested numerous times by Skyjack's chief engineer Otto Hutka by operating at full height, placing one and a third times the machine capacity (1,133 pounds) twelve inches from the leading edge of the working platform and, on a flat surface, driving the lift over a

---

[3]Further, Defendant Skyjack notes that Johnson never visited the scene of the accident, and the professional engineers that went to the scene (RTE) came in July 2005, several months after Johnson's test. The amount of slope Johnson used in his test, then, differs from the slope of the accident scene. Additionally, defendant notes that the test surface was a wood platform, whereas the accident surface was concrete (and wood and concrete have different properties which were not accounted for in the test results). Finally, there is no mention in Johnson's report of weather conditions; Johnson documented wind speed at the time of the accident by watching the evening news. It was raining the day of the simulation, but dry the day of the accident.

drop off with two wheels.[4]  Plaintiffs state that, in comparison, Sappington was operating an SJII 4626 without pothole protection, working on a level surface with only approximately 304 pounds centered well back of 12 inches from the leading edge of the platform, and the SJII 4626 tipped over.  Plaintiffs state that this demonstrates that the SJIII remains upright in far worse conditions than the Johnson test; further, plaintiffs provide an affidavit from their other design defect expert, Dr. Blundell, purportedly deflecting defendants' criticisms of the test.  Plaintiffs further note that Johnson's data was available to defendants, but that defendants conducted no further tests.  Plaintiffs conclude that the dissimilarities between the accident and the test affect the weight of the evidence, not its admissibility.  <u>Champeau v. Fruehauf Corp.</u>, 814 F.2d 1271, 1278 (8th Cir. 1987), citing <u>Randall v. Warnaco, Inc.</u>, 677 F.2d 1226, 1233-34 (8th Cir. 1982).

After considering the parties' arguments, the Court finds that Johnson's test is not relevant to the issues presented in this matter, nor is it reliable.  Defendant correctly notes that relevance should be determined by the Court in its gatekeeper function, and the Court does not even reach the issue of the weight the evidence should be accorded if the evidence is inadmissible.  Here, there are significant and numerous dissimilarities between the test and the accident.  Johnson's test proves that a lift that was not manufactured until two years after the subject lift was manufactured, with a base weight of 672 pounds more than the subject lift, with a weight atop it 84 pounds less than that on the day of the accident, did not topple over when tested on a dissimilar slope made out of dissimilar

---

[4]In support of this proposition, plaintiffs cite Exhibit D to Doc. No. 93, deposition excerpts of Otto Hutka.  However, Mr. Hutka's cited testimony does not reference height, weight, and distance from the leading edge; instead, it only refers to two-wheel drop-off testing.  <u>The cited testimony, therefore, does not support plaintiffs' assertion, and the Court will not use this inaccurately cited testimony to create an issue of disputed fact where none exists.</u>

material. This is not testimony that will be useful to the finder of fact in deciding the ultimate issue of fact, whether the SJII 4626 is a defective product. Furthermore, although plaintiffs indicate that defendants did no testing, defendants do not need to reproduce Johnson's test to show that it is faulty. Johnson's test is so dissimilar from the conditions of the accident that it is not relevant or reliable as to the facts at issue in this case. Therefore, defendant Skyjack's Motion to Bar Testimony of Bryan Johnson (Doc. No. 85) is **GRANTED.**

> C. Defendant RSC's Motion to Exclude Expert Testimony of Ken Blundell and Suggestions in Support (Doc. No. 81) and Defendant Skyjack Inc.'s Motion to Bar Dr. James Kenneth Blundell (Doc. No. 87)

Both defendants have filed motions to exclude the testimony of Dr. Blundell, arguing that his opinions are unreliable and therefore inadmissible. Blundell's first stated opinion is that the SJII 4626 was unreasonably dangerous since it lacked a pothole protection device. Blundell testified that any scissor lift manufactured after 1987 without pothole protection is defective and unreasonably dangerous because the only reasonably safe product is state-of-the-art, which Blundell defines as "technically and economically feasible at a given point in time" (Blundell depo. p. 78). He bases this opinion on the fact that a company named MEC began using pothole protection on its scissor lifts in 1987.[5] Blundell opined that once a manufacturer develops an innovation and brings it to market, all similar products are unreasonably dangerous until they develop similar technology (Blundell Depo. p. 116). Blundell concedes, however, that the SJII 4626 scissor lift complied with the applicable ANSI standard at the time of manufacture. He further admits that neither the 1990 ANSI standards nor the 1999 ANSI standards mandate the use of pothole protection

---

[5]Blundell does not have independent knowledge of this fact; instead, he relies solely on the expert report of former plaintiff's expert Kenneth Zimmer.

on a scissor lift (in fact, neither of these standards reference pothole protection). Blundell does not know whether or not MEC's scissor lift manufactured in 1987 with pothole protection is any more stable than the 1995 SJII 4626 scissor lift that is the subject of this lawsuit; Blundell further testified that if MEC's 1987 lift produced the same degree of safety as the SJII 4626, then Skyjack would not have needed to add pothole protection to the SJII 4626 (Blundell Depo. p. 82).

Defendant Skyjack further notes that had Blundell reviewed Zimmer's testimony, he would have learned that (1) MEC needed to incorporate the drop-down stabilizers to conform with existing stability standards, while Skyjack machines of the same time already conformed with stability standards without the need for pothole protection, and (2) MEC's machines were narrow aisle machines, whereas the SJII 4626 does not fall under the accepted definition of a narrow aisle scissor lift. Defendant Skyjack also notes that the testing Blundell relied upon, Mr. Johnson's tests of the SJIII 4626, was flawed (as detailed above). Blundell testified he does not know whether the addition of nearly 100 pounds of weight to the platform of the SJIII 4626 that was tested could have caused it to tip over (Blundell Depo. p. 128).[6] Defendant Skyjack further notes that Blundell believes the purpose of Johnson's test was to demonstrate that the SJIII was a reasonably safe alternative to the SJII (Blundell Depo at pp. 106-107). However, Skyjack states that (1) the inaccuracies of Johnson's SJIII test show that no conclusions can be drawn from it with respect to Sappington's accident, and (2) the SJIII was not an alternative design in 1995, when the subject SJII lift was built, as the SJIII did not enter the marketplace until late 1997.

---

[6]Plaintiffs have filed an additional affidavit from Dr. Blundell attempting to explain this testimony. However, as will be seen below, this affidavit should be stricken as an attempt to change this witness's testimony after the close of discovery.

Defendant RSC cites <u>Milanowicz v. The Raymond Corporation</u>, 148 F.Supp.2d 525 (D. N.H. 2001), for the proposition that the testimony of Dr. Blundell should be stricken.  In <u>Milanowicz</u>, the plaintiff was injured while adjusting forks on a lift truck, which was manufactured by the defendant Raymond Corporation in 1991.  Plaintiff retained an engineer who opined that because powered fork positioners were available in 1991, the defendant should have incorporated them into its lift truck.  The expert conceded that (1) the subject lift complied with the applicable ANSI standard for lift trucks; and (2) the ANSI standard did not require the powered fork positioners the expert maintained should be required.  The expert could not identify any industry standard or scientific literature which requiring fork positioners as standard equipment nor could he identify any professional organization or consumer group which had taken the position that Raymond Model 40 lift trucks or similar trucks should be outfitted with powered fork positioners as standard equipment.  Additionally, the expert did not perform any substantive testing of either the allegedly defective design or his proposed alternative.  The Court in <u>Milanowicz</u> identified the following factors to look to as indicia of reliability: (1) federal design and performance standards; (2) standards established by independent standards organizations; (3) relevant literature; (4) evidence of industry practice; (5) product design and accident history; (6) illustrative charts and diagrams; (7) data from scientific testing; (8) the feasibility of suggested modification; and (9) the risk-utility of suggested modification.  <u>Id.</u> at 536.  The court in <u>Milanowicz</u> found that beyond general design principles, nothing in the scientific literature suggested peer review of the expert's opinions.  Upon motion by the defendant, the Court found "[the expert's] testimony falls short of the reliability standards of Rule 702" and granted summary judgment in favor of the defendant.  <u>Id.</u> at 541.

Defendant RSC that, in addition to previously raised issues and similar to the issues

in <u>Milanowicz</u>, (1) Blundell has never published any articles regarding his opinions, and has never written any manufacturers or trade groups regarding his opinions; (2) his opinions come solely from the information he has reviewed in this case, and he did not consult texts or perform tests to reach his opinions; (3) Blundell performed no stability calculations (including calculations of center of gravity) in this matter, and admitted that without having conducted any stability calculations, no one can do a proper theoretical analysis of what the capabilities of the SJII 4626 (and SJIII 4626) are; (4) he has no independent knowledge of whether other scissor lift manufacturers were using pothole protection in the 1990s, basing the information in his report on that of plaintiff's abandoned expert, Zimmer; and (5) he has not designed a retrofit pothole protection device for the SJII 4626 scissor lift, and he does not know if such a retrofit device is even feasible.

Plaintiffs state, in response, that defendants' motions are flawed in that they (1) ignore many of the significant facts in this case; (2) attempt to cast Dr. Blundell's testimony into a state of the art framework which is irrelevant under Missouri law[7]; and (3) attempt to take numerous insignificant facts out of context, all of which go to the weight (not admissibility) of Dr. Blundell's opinions.

Plaintiffs note that, although defendants attempt to make it seem as though Blundell's theory has not been subject to peer review, the "peer review" is actually complete in that the entire scissor lift industry now uses the safety device (pothole protection) which Dr. Blundell advocates. Further, Skyjack recognized the importance of this safety feature at least as early as January 1995 (8 months before the machine at issue in this case was

---

[7]However, the Court notes that plaintiff's expert, Blundell, introduced "state of the art" as a concept in this case in his expert report. <u>See</u> Blundell's October 25, 2005 report (Exhibit B to Doc. No. 81, top of page 6), which provides that "When the accident unit was sold in August 1995, the Skyjack II 4626 did not comply with the state of the art of the scissor lift industry."

manufactured), when in an internal memo, Skyjack noted "the problem of tip-overs," the number of accidents that could have been prevented with pothole protection, and that the entire SJIII line of products would be equipped with "pothole protection."  Doc. No. 92, Ex. H (Bates stamp 167-168).[8]

Plaintiff also states that Skyjack has conducted its own test of the SJIII 4626, and that those tests showed that, operating at full height placing one and a third times the machine capacity (1,133 pounds) twelve inches from the leading edge of the working platform, and on a flat surface, driving the lift over a drop off, dropping off two wheels, the SJIII 4626 remained stable under tests conducted 30-50 times.[9]  Plaintiffs say, conversely, that decedent was operating an SJII 4626, without pothole protection, that tipped over with "only approximately 304 pounds centered well back from 12 inches from the leading edge of the platform."  Plaintiffs state this confirms that if decedent was operating an SJIII 4626 on the date of the occurrence, he would be alive today.  Plaintiffs further opine that it was unnecessary for Blundell to compare the SJII 4626 to "some 1987 model machine", as suggested by defendants, as the SJIII would have saved Sappington's life had it been utilized.

Further, plaintiffs attempt to distinguish this case from Milanowicz, by looking to the factors identified in the Milanowicz opinion.  With respect to federal design and performance standards and independent standards organizations, plaintiffs indicate that

_____

[8]However, it is notable the internal memo does not list the SJII 4626 as one of the models that had a problem with tipovers.

[9]Again, in support of this proposition, plaintiffs cite deposition excerpts of Otto Hutka.  As discussed previously, Mr. Hutka's cited testimony does not reference height, weight, and distance from the leading edge; instead, it only refers to two-wheel drop-off testing.  The Court will not draw the conclusion that Mr. Hutka's testimony stands for the proposition plaintiffs state in their briefs.

while no federal standards apply, the ANSI standards do apply, and Mr. Blundell considered these, noting that the current "minimum standard" of the ANSI requires the design that he advocates.[10] With respect to relevant literature, plaintiffs state that there is no relevant literature, and defendants do not represent to the Court that any exists. With respect to industry practice, plaintiffs state that the alternative design recommended by Blundell is now used by Skyjack and on machines rented out by RSC. With respect to product design and accident history, plaintiffs state that "the simple fact that Skyjack has designed the SJIII with pothole protection, precisely what Blundell opines is the defective condition with the SJII, should show this Court that Blundell's opinion that the SJII should have the same protection is reliable."[11] With respect to charts and diagrams, plaintiffs state this is not the type of case that needs charts or diagrams, and "this indicia is not relevant to a determination of reliability." With respect to scientific testing, plaintiffs state that Blundell considered the "reliable testing of plaintiffs' other expert Bryan Johnston,"[12] and also, "probably more importantly, Blundell's advocated design has been thoroughly tested by defendant Skyjack, prior to its introduction of the SJIII into the marketplace."[13] Finally,

---

[10]However, the current minimum standard (from 1999) does not apply to a machine made in 1995. Further, the ANSI does not require drop-down pothole protection; instead, it sets a minimum stability standard, which is commonly met through the use of pothole protection.

[11]The Court notes that it does not necessarily follow that just because Skyjack now utilizes a certain design feature, all previously manufactured devices without that design feature are defective. Furthermore, it appears that in 1995, there were no reported accidents involving the SJII 4626. See Doc. No. 92, Ex. H (Bates stamp 167-168).

[12]As detailed above, these tests have been found to be irrelevant and unreliable to the facts at issue in this matter.

[13]Notably, Blundell does not appear to have conducted any independent testing of the accident lift, the SJIII 4626, or the MEC lift that first utilized pothole protection.

13

with respect to feasibility of the suggested modification and risk-utility of the suggested modification, plaintiffs assert these are easily met, as the alternative design is already manufactured by Skyjack.[14]

After reviewing the parties' briefs and exhibits, the Court finds that Dr. Blundell should be barred from testifying in this matter. Blundell's opinions come solely from information he has reviewed in this case. <u>See</u> Ex. A to Doc. No. 109, p. 147, ll. 12-21. Blundell has not performed any independent testing, and the testing he relies upon performed by Johnston is so flawed that it is unreliable and not relevant to this matter. The current ANSI standard does not mention pothole protection, nor does it require it. Dr. Blundell does not cite any industry publications, even though there are trade publications unique to the lift industry. As for trade practices, Skyjack states (and this Court agrees) that the proper practices to examine are those from 1995, when the 1990 ANSI standard was in place. As for product design and accident history, in 1995 there were no reported tipovers with the SJII 4626. Skyjack asserts that it took years of research and development to finalize the design of the SJIII. This Court concurs with defendants that it is illogical to conclude, with no factual basis, that, because an alternative design is made today, it must have been a feasible design in 1995.

Therefore, for the foregoing reasons, Defendant RSC's Motion to Exclude Expert Testimony of Ken Blundell and Suggestions in Support (Doc. No. 81) and Defendant Skyjack Inc.'s Motion to Bar Dr. James Kenneth Blundell (Doc. No. 87) are **GRANTED.**

D.     Motion to Strike January 17, 2006 Affidavit of J. Kenneth Blundell (Doc. No. 111)

Defendant Skyjack Inc. moves to strike the January 17, 2006 affidavit of J. Kenneth

_____

[14]Notably, however, the Skyjack lift with pothole protection was not being manufactured in 1995.

Blundell, which was drafted in response to the defendants' motions to bar his testimony. Although Blundell states in his January 17 affidavit that defendants were mischaracterizing his testimony and his affidavit serves to clarify his opinions, defendant Skyjack states that his post-deposition affidavit is in conflict with his deposition testimony.

Specifically, as detailed elsewhere, there was a discrepancy between the amount of weight that was on the platform of the lift when Doyle Sappington tipped over and the weight that was on the platform of the lift that Bryan Johnson tested. At Blundell's deposition, the following exchange occurred:

> Q: "Depending on the positioning on the platform is it possible that the addition of a hundred extra pounds on Mr. Johnson's lift would have caused Mr. Johnson's lift to tip over?"
>
> A: "I don't know the answer to that."
>
> Q: "So, it's possible that that factor in and of itself would have been enough to have Mr. Johnson's SJ III tip over?"
>
> A: "Well, I can't speculate one way or the other and I don't think anybody can speculate. Your guys can't speculate, and I can't speculate."

Blundell states in his January 17 affidavit that in his answer, he was considering the full range of positions on the platform for an additional 100 pounds, including being situated at the leading edge of the platform. Blundell says he could not speculate as to what would happen if the weight was at the leading edge of the platform. However, Blundell stated in the January 17 affidavit that had he been asked a different question (whether the addition of 100 pounds on the platform centered no closer than 12 inches from the leading edge of the lift in the direction of travel would have caused the lift to tip over), he would not have had to speculate. Blundell states that the unit used in Johnson's test would have remained stable had the extra 100 pounds been centered 12 inches away from the leading edge. Blundell further states that "We also know from review of photographs that the center of

15

gravity of the additional materials on the Sappington lift was well back of twelve inches from the leading edge of the platform." Blundell further states that although a "proper theoretical analysis" cannot be conducted (p. 30 of his deposition), that does not mean that a proper practical analysis cannot be conducted.

Defendant Skyjack states that Blundell has offered no explanation why this new distinction was raised for the first time after discovery was closed. Skyjack notes that statements in a post-deposition affidavit that conflict with earlier deposition testimony are generally considered an attempt to create a "sham" issue. Northwest Hamilton Lake Dev. Co., L.L.C. v. American Federal, Inc., 2006 WL 47432 (E.D. Mo. 2006). Skyjack also states that the weight placement referenced in the January 17 affidavit appears to have been taken from the ANSI test for scissor lifts, but that there has never been a two-wheel drop-off test under the ANSI. Skyjack further states that its employee and expert, Hutka, when testifying to the two-wheel drop-off tests performed by Skyjack, does not describe the weight used, the positioning of the weight on the platform, or the position of the scissor stack on the leading or trailing edge. Defendant Skyjack also questions the photos referenced in the affidavit, "[s]ince the only photos produced to date show tools and materials spread on the floor following the fall."

In response, plaintiffs state that defendant's motion is an "impermissible attempt to take certain testimony from Dr. Blundell out of context and then **claim** that Dr. Blundell is changing his opinions. As explained in Dr. Blundell's affidavit, he answered the questions posed to him correctly. However, Skyjack chose to ask him a quick trick question and now seeks to take that trick question out of context and **claim** that Dr. Blundell is changing his testimony." Plaintiffs also state that Skyjack "refused" to provide information as to the center of gravity of the SJII 4626 or the SJIII 4626. Plaintiffs state "Skyjack is attempting

to use its own failure to provide responsive documentary discovery (or possibly Skyjack doesn't know it themselves) as a tactical weapon to ask Dr. Blundell a series of questions that only a person armed with the data regarding the center of gravity could answer." Plaintiffs further state that the affidavit was provided in response to the <u>Daubert</u> motions on Blundell and Johnson to explain how Skyjack was taking Blundell's testimony out of context to make it appear that Blundell had changed his opinion to state that he didn't know whether the difference in weight on the platform could have caused the lift used in the Johnson test to tip over.

In reply, Skyjack again characterizes this as a departure from Blundell's previous testimony, not a clarification. Skyjack states that if the affidavit is permitted, "Dr. Blundell's testimony will change from 'Nobody could know whether the lift would remain stable. It is speculative,' to 'I know with certainty that the lift would remain stable.'" Defendant also notes that although plaintiffs now characterize this as a "quick trick question," no objection was made to the question. Further, defendant states that plaintiffs have not pointed to a specific request for stability data, nor did plaintiffs seek Court intervention to compel production of "withheld" documents.

After reviewing the parties' briefs, the Court finds that Dr. Blundell's January 17 affidavit should be stricken, as it is a change in testimony from Dr. Blundell's earlier deposition. Defendant Skyjack's motion to strike (Doc. No. 111) is **GRANTED.**

## III.    Summary Judgment Motions/Related Issues

### A.    Plaintiffs' Motion to Strike Defendant Skyjack Inc.'s Motion for Summary Judgment (Doc. No. 112)

Plaintiffs request that defendant Skyjack's motion for summary judgment be stricken because it was untimely filed. Specifically, the Court's Third Amended Scheduling and Trial

Case 3:04-cv-05076-FJG   Document 196   Filed 08/01/06   Page 17 of 23

Order (Doc. No. 68) states that motions for summary judgment were due to be filed on January 30, 2006, and that all motions should be filed before 5:00 p.m. on the date that they are due. According to the notice of electronic filing for Skyjack's Motion for Summary Judgment (Doc. No. 104), the motion was filed at 6:10 p.m. on January 30, 2006. Plaintiffs state that Skyjack neither sought nor received an extension of time in which to file the summary judgment motion, and therefore the motion should be stricken.

Defendant Skyjack responds that it was confused because the Court's original scheduling and trial orders did not require motions to be filed by a specific time (see Doc. Nos. 16, 44, and 59). Skyjack states that as the primary focus of the motion to amend that resulted in the Third Amended Scheduling and Trial Order was to change the deadlines of Daubert motions, Skyjack interpreted the Order to require all filings related to the Daubert motions to be filed by the 5:00 p.m. deadline. Defendant states that assuming arguendo that the 5:00 p.m. deadline applies to all motions in the case, Skyjack's motion should not be stricken because plaintiffs were not prejudiced in any way by the late filing of the motion. Skyjack also notes that consideration on the merits may save resources in that a jury trial may be avoided if summary judgment is granted.

The Court finds, after considering the parties' arguments, that the motion to strike (Doc. No. 112) should be **DENIED.** In particular, defendant's motion was filed late by only one hour, and plaintiffs have not shown how that short delay caused them prejudice. The Court will consider defendant Skyjack's motion for summary judgment, below.

      B.     Defendant Skyjack's motion for summary judgment (Doc. No. 104)

           1.     Standard

Summary judgment is appropriate if the movant demonstrates that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of

law.  Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).  The facts and inferences are viewed in the light most favorable to the nonmoving party.  Fed. R. Civ. P. 56(c); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-590 (1986).  The moving party must carry the burden of establishing both the absence of a genuine issue of material fact and that such party is entitled to judgment as a matter of law.  Matsushita, 475 U.S. at 586-90.

Once the moving party has met this burden, the nonmoving party may not rest on the allegations in the pleadings, but by affidavit or other evidence, must set forth facts showing that a genuine issue of material fact exists.  Fed. R. Civ. P. 56(e); Lower Brule Sioux Tribe v. South Dakota, 104 F.3d 1017, 1021 (8th Cir. 1997).  To determine whether the disputed facts are material, courts analyze the evidence in the context of the legal issues involved.  Lower Brule, 104 F.3d at 1021.  Thus, the mere existence of factual disputes between the parties is insufficient to avoid summary judgment.  Id.  Rather, "the disputes must be outcome determinative under prevailing law."  Id. (citations omitted).

Furthermore, to establish that a factual dispute is genuine and sufficient to warrant trial, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the facts."  Matsushita, 475 U.S. at 586.  Demanding more than a metaphysical doubt respects the appropriate role of the summary judgment procedure: "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action."  Celotex, 477 U.S. at 327.

      2.    Analysis

Skyjack moves for summary judgment on the basis that plaintiffs cannot prove their

claim for strict products liability (the only claim remaining in this lawsuit). The elements of the claim are (1) the defendant transferred a product in the course of his business; and (2) the product was used in a manner reasonably anticipated; and (3) either or both of the following: (a) the product was then in a defective condition unreasonably dangerous when put to a reasonable anticipated use, and the plaintiff was damaged as a direct result of such defective condition as existed when the product was sold; or (b) the product was then unreasonably dangerous when put to a reasonably anticipated use without knowledge of its characteristics, and the plaintiff was damaged as a direct result of the product being sold without an adequate warning. RSMo § 537.760. Defendant Skyjack indicates that there is no indication that the product was modified prior to the accident; instead, the sole issue remaining in this case is whether the lift's lack of drop-down stabilizer bars at the time of manufacture constituted a product defect.

Defendant notes that plaintiffs' experts, as detailed above, are unreliable. Defendant states that where a product is free of latent defects and concealed dangers; where the perilous nature of the product and the danger of using it is obvious and not concealed; where its normal functioning creates no danger not known or appreciated by the user; where it is properly manufactured to accomplish the function for which it is designed, the manufacturer has satisfied the law's demands and is under no duty to make it "more" safe by providing a built-in safety device. Morrison v. Kubota Tractor Corp., 891 S.W.2d 422 (Mo. App. W.D. 1994) (tractor manufacturer case where tractor was sold without a roll over protection system; Court found no duty to install roll over protection at time of accident or to retrofit same, as the condition was open and obvious).

As for the SJIII being a reasonable alternative design, defendants note that the subject lift was built in 1995, whereas the SJIII was not manufactured until 1997, and was

Case 3:04-cv-05076-FJG   Document 196   Filed 08/01/06   Page 20 of 23

still in the design phase at the time of the manufacture of the Sappington lift. Defendant finally notes that it is likely the sole proximate cause of the accident was operator negligence.

Plaintiffs respond that there are several disputed facts; however, many of these disputed facts are found in plaintiffs' experts' testimony, which is now barred. Plaintiffs further cite the deposition testimony of defendant's expert Otto Hutka for the proposition that Skyjack has tested the model SJIII 4626 numerous times with more than 850 pounds on the platform and driven it with two wheels going over a drop off, and the SJIII passed that test every time; however, as detailed above, this testimony does not reference height of the lift, weight atop the lift, and distance of the weight from the leading edge of the lift; instead, it only refers to two-wheel drop-off testing. As discussed earlier, the cited testimony does not support plaintiffs' assertion, and the Court will not use this inaccurately cited testimony to create an issue of disputed fact where none exists.

Defendant replies that plaintiffs' experts have concluded without factual support that the SJII 4626 was unreasonably dangerous because it lacked drop-down stabilizer bars. However, defendant states there is no dispute that (1) the lift complied with industry standards; and (2) the lift can be (and has been) used safely when directions are followed. Defendant further states that even if the affirmative defense of Sappington's contributory negligence represents a question for the jury, that issue would not even come into play until plaintiffs establish that they are entitled to recover on a products liability theory.

The Court agrees that plaintiffs, without relevant and reliable expert testimony supporting their case, cannot demonstrate that they are entitled to recover on a products liability theory. Consequently, defendant Skyjack's motion for summary judgment (Doc. No. 104) should be **GRANTED**.

21

Furthermore, although defendant RSC has moved for summary judgment for reasons other than those cited by defendant Skyjack, the Court finds that as plaintiffs are unable to demonstrate a product defect that caused the injuries at issue in this lawsuit, summary judgment should be granted as to defendant RSC on these same grounds. Therefore, defendant RSC's motion for summary judgment (Doc. No. 100) will be **GRANTED IN PART** as it relates to dismissal of all claims against it, and will be **DENIED AS MOOT IN PART** as it relates to the specific arguments raised in defendant RSC's motion.

## IV. Conclusion

For the reasons stated above,

(1) defendant Skyjack Inc.'s Motion to Bar Bryan Johnson (Doc. No. 85) is **GRANTED**;

(2) defendant Rental Service Corporation's Motion to Join Defendant Skyjack, Inc.'s Motion to Bar Bryan Johnson (Doc. No. 86) is **GRANTED**;

(3) Defendant RSC's Motion to Exclude Expert Testimony of Ken Blundell and Suggestions in Support (Doc. No. 81) is **GRANTED**;

(4) Defendant Skyjack Inc.'s Motion to Bar Dr. James Kenneth Blundell (Doc. No. 87) is **GRANTED**;

(5) Defendant Skyjack Inc.'s Motion to Strike January 17, 2006 Affidavit of J. Kenneth Blundell (Doc. No. 111) is **GRANTED**;

(6) Plaintiffs' Motion to Strike Defendant Skyjack Inc.'s Motion for Summary Judgment (Doc. No. 112) is **DENIED**;

(7) Defendant Skyjack's Motion for summary judgment (Doc. No. 104) is **GRANTED**;

(8) Defendant RSC's Motion for Summary Judgment (Doc. No. 100) is **GRANTED**

**IN PART** as it relates to dismissal of all claims against defendant RSC and **DENIED AS**

**MOOT IN PART** as it relates to the specific arguments raised in defendant RSC's motion;

and

      (9) All remaining pending motions are **DENIED AS MOOT.**


      **IT IS SO ORDERED.**

                                **/S/ FERNANDO J. GAITAN, JR.**
                                Fernando J. Gaitan, Jr.
                                United States District Judge

Dated:  August 1, 2006
Kansas City, Missouri